## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

SARNITRA VALDERY-HUGHES                           CIVIL ACTION

VERSUS                                              No. 24-1708

CARE AND DEVELOPMENT
CENTER, INC., ET AL.                               SECTION I

### ORDER AND REASONS

Before the Court is a motion[1] to certify a proposed collective action filed by plaintiff Sarnitra Valdery-Hughes ("plaintiff"). Defendants Care and Development Center, Inc. ("CDC"), and Gilbert Charles (collectively, "defendants") filed a response in opposition.[2] Plaintiff filed a reply.[3] For the reasons set forth below, the Court denies plaintiff's motion.

## I. BACKGROUND

This lawsuit concerns defendants' alleged failure to pay overtime pursuant to the Fair Labor Standards Act ("FLSA"). "The FLSA protects employees (not independent contractors) by establishing a minimum hourly wage, maximum work hours, and overtime compensation for work beyond 40 hours per week." *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 434 (5th Cir. 2021). Section 216(b) of the FLSA permits employees to maintain an action against their employer for violating the FLSA on behalf of themselves and those "similarly situated." 29 U.S.C. § 216(b).

---

[1] R. Doc. No. 24.
[2] R. Doc. No. 27.
[3] R. Doc. No. 30.

An action maintained by employees on behalf of themselves and those similarly situated is referred to as a "collective action." *Swales*, 985 F.3d at 433.

Plaintiff brought this lawsuit by filing what she entitled a "collective action complaint."[4] The complaint alleges that defendants operate a business providing services to persons needing home care.[5] Plaintiff and others similarly situated allegedly worked as home care givers, or "direct service workers" ("DSWs").[6] With respect to plaintiff in particular, she states that she worked for defendants approximately between 2020 and 2023 at an hourly rate of $10.00 per hour.[7] Plaintiff alleges that she would work in excess of 40 hours per week but was not paid overtime as required by the FLSA.[8] She estimates that there are dozens, if not hundreds, of other DSWs who worked more than 40 hours per week but were denied overtime.[9] She thus brings this lawsuit as a collective action pursuant to § 216(b) on behalf of DSWs who, since December 2020, have not been paid overtime notwithstanding working more than 40 hours in a week.[10] She claims that defendants failed to comply with the FLSA "by implementing a management policy, plan or decision that intentionally provided for the compensation of [DSWs] as if they were exempt from coverage under [the FLSA], disregarding the fact that they were not exempt."[11]

---

[4] R. Doc. No. 1.
[5] *Id.* ¶ 9.
[6] *Id.* ¶ 24.
[7] *Id.* ¶¶ 32–33.
[8] *Id.* ¶¶ 34–35.
[9] *Id.* ¶¶ 24, 26.
[10] *Id.* ¶ 24.
[11] *Id.* ¶ 38.

In her complaint, plaintiff requests several forms of relief. She seeks (1) a declaratory judgment that defendants have violated the FLSA, (2) an injunction prohibiting defendants from paying DSWs as though they were independent contractors, (3) unpaid overtime, (4) liquidated damages, and (5) reasonable attorney's fees.[12]

Plaintiff filed the instant motion to certify a collective-action class and facilitate notice to all prospective class members.[13] Her motion explains that CDC is paid by Medicaid for providing home care for people struggling with physical infirmities and disabilities.[14] Essentially, plaintiff contends that CDC contracts with the State of Louisiana to serve as a covered provider.[15] In turn, CDC hires DSWs to provide home care.[16]

Based on the corporate deposition of CDC in a legally-related matter, plaintiff asserts that defendants classify all DSWs as independent contractors,[17] for which reason they were not entitled to overtime pay pursuant to the FLSA. *See Swales*, 985 F.3d at 434. While working as a DSW for CDC, plaintiff states that she herself was classified as an independent contractor or "1099 worker."[18] In light of the information obtained at the corporate deposition, plaintiff asserts that defendants applied this

---

[12] *Id.* at 9–10.
[13] R. Doc. No. 24.
[14] R. Doc. No. 24-1, at 3.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 4–5; *see* R. Doc. No. 24-2, at 24.
[18] R. Doc. No. 24-1, at 4; *see also* R. Doc. No. 24-3, ¶ 6 (declaration of plaintiff Sarnitra Valdery-Hughes).

policy of classifying DSWs as independent contractors to more than 100 DSWs during the period of 2021 to present.[19]

> Plaintiff defines the prospective collective-action class as:
>
> [a]ll persons who worked for [CDC] as a [DSW] from 2022 to the present who worked more than 40 hours a week, but were not paid for all of the overtime that they worked due to [d]efendants' policy of classifying them as independent contractors or "1099 employees" and not paying overtime on all hours worked in excess of 40 hours per any given 7-day work period.[20]

In her motion, plaintiff notes that one prospective class member, Delicia Parker ("Parker"), has already decided to join this lawsuit.[21] To facilitate notice to other prospective class members, plaintiff requests that this Court approve plaintiff's proposed notice forms and her proposed plan for their distribution.[22]

## II. STANDARD OF LAW

Section 216(b) of the FLSA provides for collective actions by permitting FLSA actions against employers to "be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). On the one hand, the collective-action mechanism advances the dual goals of "(1) enforcement (by preventing violations and letting employees pool resources when seeking relief); and (2) efficiency (by resolving common issues in a single action)." *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 435 (5th Cir.

---

[19] R. Doc. No. 24-1, at 4; *see also* R. Doc. No. 24-2, at 189–92 (corporate deposition of defendant CDC).
[20] R. Doc. No. 24-1, at 5.
[21] *Id.* at 2; *see also* R. Doc. No. 5 (consent form to join collective action by Delicia Parker).
[22] R. Doc. No. 24-1, at 18–19.

2021). On the other hand, the mechanism poses certain dangers: "(1) the opportunity for abuse (by intensifying settlement pressure no matter how meritorious the action); and (2) the appearance of court-endorsed solicitation of claims." *Id.*

The procedure of the collective-action mechanism differs markedly from that for class actions proceeding pursuant to Federal Rule of Civil Procedure 23. *See, e.g.*, *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("Rule 23 actions are fundamentally different from collective actions under the FLSA."); *In re A&D Ints.*, *Inc.*, 33 F.4th 254, 257 (5th Cir. 2022) ("This case involves a 'collective action' not a class action, and the two mechanisms have important differences . . . ."). Whereas members of a class action are bound by the judgment unless they affirmatively opt out of the litigation, members of a collective action must opt into the collective action by written consent. *Swales*, 985 F.3d at 435. Furthermore, unlike Rule 23 which governs the certification of class actions and the notification of class members, § 216(b) "says nothing about 'certification' or 'notice.'" *Id.*

Although § 216(b) does not assign the district court a role in the collective-action procedure, the district court nonetheless performs a "pivotal" one in overseeing the notice and opt-in process. *Id.* "[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). "Court authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Id.* at 173. The district court's discretion is necessary because the benefits of the collective-action mechanism

5

"depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* at 170. By overseeing notice, district courts "manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure." *Id.* Though needed, the district court's discretion is not "unbridled." *Id.* at 174. District courts must not solicit claims and "must take care to avoid even the appearance of judicial endorsement of the merits of the action." *See id.*

In *Swales v. KLLM Transportation Services, L.L.C.*, 985 F.3d 430 (5th Cir. 2021), the Fifth Circuit established a framework for determining whether the district court should facilitate notice of a collective action. Significantly, the *Swales* court rejected the predominantly used two-step approach formulated in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987). *Id.* at 441.

Pursuant to the *Swales* framework, "[d]istrict courts should rigorously enforce the FLSA's similarity requirement at the outset of the litigation." *Klick v. Cenikor Found.*, 94 F.4th 362, 368 (5th Cir. 2024) (cleaned up). To do so, "[a] district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Swales*, 985 F.3d at 441. With those considerations in hand, the district court "should authorize preliminary discovery accordingly." *Id.* "The amount of discovery necessary to make that determination will vary case by case." *Id.*

"To decide whether a group of employees is similarly situated, the district court must consider whether merits questions can be answered collectively." *Loy v. Rehab Synergies, L.L.C.*, 71 F.4th 329, 336 (5th Cir. 2023) (internal quotation marks and citation omitted). District courts may apply the factors used under the *Lusardi* approach to make that determination. *See id.* at 336–37. These factors include: "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Swales*, 985 F.3d at 437. (internal quotation marks and citation omitted). However, "use of [the *Lusardi*] factors is not mandatory, as there is no one-size-fits-all analysis or mechanical test to apply." *Loy*, 71 F.4th at 336. "Whether merits questions can be answered collectively has nothing to do with endorsing the merits." *Swales*, 985 F.3d at 442. "It is the plaintiffs' burden to establish that they are similarly situated." *Loy*, 71 F.4th at 336.

"After considering all available evidence," the district court may proceed in several ways. *See Swales*, 985 F.3d at 443. The district court may find that the proposed class is not similarly situated or that plaintiffs have not met their burden of establishing similarity. *See id.* The district court may find that the proposed class, or a subcategory thereof, is similarly situated. *See id.* Alternatively, "[t]he district court may instead decide that it needs further discovery to make this determination." *See id.* "The bottom line is that the district court has broad, litigation-management discretion here." *Id.*

7

## III. ANALYSIS

Pursuant to *Swales*, this Court must first identify which legal considerations are material to whether prospective class members are similarly situated. *See Swales*, 985 F.3d at 441. Since that determination concerns whether the merits questions can be collectively resolved, *see Loy*, 71 F.4th at 336, the elements of plaintiff's FLSA claim are relevant.

To succeed on an FLSA overtime-wage claim, a plaintiff must prove "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Gray v. Killick Grp., L.L.C.*, 113 F.4th 543, 549 (5th Cir. 2024). As identified by the parties, the dispute in this case chiefly concerns the first element, the employer-employee relationship. Plaintiff claims that such a relationship did exist even though defendants classified plaintiff as an independent contractor.[23] Defendants maintain that DSWs are independent contractors, for which reason DSWs are not entitled to overtime pay pursuant to the FLSA.[24]

In the Fifth Circuit, courts apply an economic-realities test to analyze whether a worker designated as an independent contractor is an employee for the purposes of the FLSA. *Id.* "To determine if a worker qualifies as an employee, [courts] focus on

---

[23] R. Doc. No. 24-1, at 4.
[24] R. Doc. No. 27, at 6–10.

8

whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Id.* (internal quotation marks and citation omitted). Courts employ five non-exhaustive factors to make that determination:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.

*Id.* No single factor is dispositive, and each factor is a tool used to gauge the ultimate question of the economic dependence of the alleged employee. *See id.* The application of the economic-realities test is particular to each individual worker rather than to a class of workers. *See Swales*, 985 F.3d at 442 (describing the economic-realities test as "highly individualized"); *cf. Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008) (explaining that, with respect to the second factor, courts consider "each worker's *individual* investment to that of the alleged employer" rather than aggregate the investments of the class of workers (emphasis in original)).

At this stage, the Court must consider whether the economic-realities test may be applied on a collective basis. *Swales*, 985 F.3d at 442 (explaining that "the district court needed to consider the evidence . . . in order to determine whether the economic-realities test could be applied on a collective basis"). This analysis does not concern whether DSWs are, in fact, employees. *See id.* The Fifth Circuit has recognized that, "[i]f answering the merits questions requires a highly individualized inquiry into each potential opt-in's circumstances, then the employees are likely not similarly

situated." *Loy*, 71 F.4th at 336 (internal quotation marks and citation omitted). Accordingly, "the individualized nature of the economics-realities test is why misclassification cases rarely make it to trial on a collective basis." *Swales*, 985 F.3d at 442.

In support of her motion, plaintiff emphasizes that plaintiff and the proposed class members were subjected to identical policies and procedures.[25] She then identifies six policies and procedures to which each of the proposed class members were allegedly subjected.[26] For example, plaintiff states that defendants promulgated policies regarding attire, attendance, tardiness, and job duties, including which tasks DSWs were forbidden to perform.[27] Plaintiff cites documentation purporting to establish that defendants subjected DSWs to these policies.[28] Plaintiff also emphasizes that DSWs were subjected to the same payroll policies.[29]

Defendants primarily counter by claiming that the evidence establishes that plaintiff and Parker are not employees in light of the economic-realities test, for which reason there is no basis to certify a collective action.[30] This argument is simply beside the point. The question at this stage is whether the merits question can be resolved on a collective basis, which is separate from the merits question itself. *See id.* However, defendants also claim that some of the documentation relied on by plaintiff

---

[25] R. Doc. No. 24-1, at 11.
[26] *Id.* at 11–12.
[27] *Id.* at 12.
[28] *Id.*
[29] *Id.* at 12–13.
[30] R. Doc. No. 27, at 6–10.

was not approved by defendants and was promulgated by a "rogue" employee.[31] Defendants also cite evidence in the form of corporate deposition testimony stating that defendants do not assign clients to DSWs in most cases because DSWs often serve clients to whom they are related.[32] In defendants' own words, "many clients insist on being cared for by family members."[33] According to defendants, opt-in plaintiff Parker primarily cared for her mother during her three-month affiliation with CDC.[34]

After considering the available evidence and the parties' arguments, the Court concludes that this lawsuit is not the rare misclassification case that may be resolved on a collective basis. For plaintiff to satisfy her burden to show that this case may be resolved on a collective basis, plaintiff must show how the policies that it highlights would allow for the near uniform application of the economic-realities test to each of the proposed class members. At bottom, plaintiff's argument rests on the contention that defendants treat all DSWs in the same manner.[35] But the relevant question here focuses on the similarity in the economic realities of the DSWs rather than how they were treated. Plaintiff has not demonstrated how the cited policies and procedures constrained the economic reality of each DSW in a sufficiently similar way to warrant this case proceeding as a collective action.

---

[31] *Id.* at 10–11.
[32] *Id.* at 11.
[33] *Id.*
[34] *Id.*
[35] R. Doc. No. 24-1, at 13; R. Doc. No. 30, at 6 ("Defendants readily admit they treated all DSWs in the same manner").

As stated above, the economic-realities test is comprised of five non-exclusive factors. *See Gray*, 113 F.4th at 549. Even if the Court were to ignore the dispute between the parties regarding the documentation cited by plaintiff and attribute that documentation to defendants, the Court finds that plaintiff has not satisfied her burden because the evidence she cites does not demonstrate that the several factors of the economic-realities test could be applied on a class-wide basis. The Court understands that the policies and procedures cited by the plaintiff relate to the first factor, or the degree of control exercised by the alleged employer. *Id.* Since "[n]o single factor is determinative," *id.* at 549 (internal quotation marks and citation omitted), the Court must also have evidence considering the class-wide applicability of the other economic-realities-test factors. However, such evidence is wanting.

Plaintiff cites no evidence regarding the relative investments of the workers of the alleged employer, no evidence regarding the skill and initiative required in performing the job, and no evidence regarding the permanency of the relationship between the worker and alleged employer. In effect, these three factors are unaddressed. Plaintiff does partly address the remaining factor—the degree to which the worker's opportunity for profit or loss is determined by the alleged employer—by citing evidence purporting to demonstrate that DSWs are subject to identical payroll policies, pursuant to which they are paid $10.00 per hour.[36] However, "[i]n evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs." *Parrish v. Premier Directional Drilling, L.P.*, 917

---

[36] R. Doc. No. 24-1, at 12–13.

F.3d 369, 384 (5th Cir. 2019) (cleaned up). Plaintiff has not demonstrated whether DSWs have costs and, if so, whether the ability to control costs is similar for all DSWs. Altogether, the Court finds that plaintiff has failed to demonstrate that the DSWs are similarly situated with respect to the employer-relationship element of their FLSA claim.

In addition, the Court finds that it would be inappropriate for this case to proceed as a collective action because of the individualized defenses available to defendants. *See Loy*, 71 F.4th at 336 (stating that courts may consider the *Lusardi* factor of whether there appears to be defenses individual to each plaintiff). Defendants explain that the LaSRS system that DSWs use to track their time also keeps geolocations of DSWs to generate images of their locations at the time they clock into and out of the system.[37] Defendants cite evidence that plaintiff's records are "riddled with" trips to such places as FedEx, Popeye's, Walmart, Wendy's, and Burger King which are allegedly outside the scope of her duties.[38] Similarly, Parker's records show unauthorized trips to, for example, a bingo hall and a mechanic.[39] In light of these trips, the computation of plaintiff's and Parker's hours is not straightforward. This consideration pertains to the third and fourth elements of an FLSA claim—that the employer violated the FLSA's overtime wage requirements and the amount of overtime compensation due, *Gray*, 113 F.4th at 549—as both elements require plaintiff to establish the number of hours that plaintiff worked. Consequently,

---

[37] *Id.* at 13–14.
[38] *Id.* at 14.
[39] *Id.* at 14–15.

this issue may go beyond the question of damages, as it also concerns whether an FLSA violation occurred in the first place.

Plaintiff counters that individual differences as to damages should not preclude certification.[40] Further, she asserts that a defendant's having to review records to calculate damages should not defeat the fact that DSWs are similarly situated.

Although district courts do not necessarily abuse their discretion when they certify a collective action despite there being individualized defenses, *see Loy*, 71 F.4th at 339, the Court nonetheless concludes that certification would be inappropriate in light of the highly individualized determinations required to compute the hours worked by DSWs. To calculate a DSW's hours may well require litigation over the accuracy of the geolocation images produced by the LaSRS system, whether a DSW was authorized to take a particular trip or was acting within the scope of their duties in doing so, and how much time must be deducted for a trip. Such a coil of individualized determinations "would quickly devolve into a cacophony of individual actions" that would defeat the purpose of collective action mechanism. *See Swales*, 985 F.3d at 442.

The cases relied upon by plaintiff are distinguishable in this regard.[41] For example, in *Hernandez v. Pritchard Industries (Southwest)*, the court certified a collective-action class of janitors even though "the employer will have to review its

---

[40] R. Doc. No. 30, at 6.
[41] *Id.* at 6–7.

records to determine whether each janitor was properly paid." No. 20-CV-508, 2021 WL 1146005, at *2 (W.D. Tex. Mar. 25, 2021). However, a "review" is much less fact-intensive and involved than the litigation that may well be required to calculate the hours a DSW worked. Similarly, in *Eltayeb v. Deli Management, Inc.*, the court held that a class of delivery drivers could be certified even though the individual drivers were paid different wages. No. 20-CV-385, 2021 WL 5907781, at *6 (E.D. Tex. Dec. 14, 2021). Since the drivers were paid different wages, the court "would later have to determine the specific damages." *Id.* However, the arithmetic required to calculate the difference between what plaintiffs earned and what they were supposed to earn is much less complicated than the individualized determinations that may be needed here.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that plaintiff Sarnitra Valdery-Hughes's motion certify a collective action and facilitate notice to prospective class members is **DENIED** as plaintiff has not met her burden of demonstrating that the prospective class members are similarly situated.

**IT IS FURTHER ORDERED** that plaintiff's request for oral argument is **DENIED**.

New Orleans, Louisiana, April 9, 2025.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**